And we'll call our second and last case of this morning, number 14-3679, Resch v. Krapfs Coaches Inc. Mr. Santillo? Santillo? Yes. And Mr. Schauer? Am I screwing up these names? Santillo is correct. Schauer? Santillo is correct. Krapfs Coaches. Krapfs Coaches. You call Krapfs? My former partner is Rob Kroff. K-R-A-P-F. Same Kroff and it was, but the other side of the family where they had a construction company was Krapfs Construction Company and they went by Krapfs and their motto was Krapfs can do it. So we'll go by Krapfs today then. May it please the court, my name is Andy Santillo, law firm of Weinbrick and Santillo and I'm here today on behalf of the plaintiff appellants. I would like to reserve, with the court's permission, five minutes for rebuttal. Let me ask you a question at the outset. You represent what, 34? 34 individuals. Transit drivers. When you do the analysis of whether they, drivers, can be called on to go across state lines, therefore be interstate, do you do it with regard to the 34? Or the 129? Because most of them did not opt in. Let's start with that. It's our position that it should be done with the 34. These are the individuals who are before the court. These are the individuals who have submitted, who have asserted claims against the company. Because of that, and because of the opt-in procedure under the Fair Labor Standards Act and 29 U.S.C. Section 216B, the liability is limited to these individuals and the analysis should be limited to these individuals. We also think that the analysis should be limited to these individuals based on the individualized analysis that we think was not done below and we think needs to be done to determine whether these individuals either drove an interstate or reasonably had expected to drive an interstate. But don't Bush-Morris and the regulations require under the motor carrier exception that you have to look at it based upon the work of the employer, and if it's covered by DOT regulations, you then move to the work of the class of employees, which makes it different than the Fair Labor Standards Act where you do look at the individual's actual work. Well, I think it's sort of two parts, Judge Schwartz. First is the part of, do they look at the work and what they're doing? Are they safe, performing duties that affect the safety operation of motor vehicles? Well, certainly people who are driving these sorts of vehicles would be. And we do not dispute that. The second part, though, is whether they did it interstate and whether that was done sufficiently in interstate to have them fit within the narrow confines of the motor carrier exemption. In Morris, the court was dealing with an injunction. The Department of Labor was trying to have a finding that this employer cannot fail to pay people time and a half going forward. In Pyramid Motors, though, it was a different scenario. They were looking back. They were looking at whether individuals can recover for past work. And the Morris court, I think, specifically noted that if this were a case where they were looking specifically at whether individuals on particular weeks fell within the Motor Carrier Act exemption, it would be a different scenario. And specifically said that that point was not in front of them. It was not in front of them whether these individuals in the past were entitled to overtime. It was only whether they were entitled to it going forward. And that's why in Morris they were able to look at sort of a class-wide point of view. But I think the class is important that it's a two-step process, that part of the work being done, but also the interstate portion of it. And you said, referring to Morris case just now, I heard you say something in terms of you would look at what the individual drivers were doing on a weekly basis. Did I mishear that? No. The court said the applicability, and this is at page 434, the applicability of the Interstate Commerce DOT's present requirements as to specific drivers during specific weeks is not the issue before us. It also said further on page 429 of that opinion, there's nothing in the record showing the extent at which the respective garage men and laborers devoted themselves to the several classes of work above mentioned, and if this were an action to recover overtime compensation for individuals and employees, it would be necessary to determine that fact. We think in this case it would be necessary to determine that fact, whether these individuals actually affected interstate commerce as is defined in the Motor Carrier Act. And we think that the factual record that was provided shows that either these individuals did not regularly travel interstate or were reasonably expected to do so. They weren't reasonably expected to do so. I thought the record indicated all of them had CELs, all of them were subject to the federal regulations for those who would be authorized to travel interstate, and the fact that they were trained on all routes and could be disciplined should they opt out of a route. And indeed, I think that at oral argument there was a concession that the defendant operated interstate routes and retained the discretion to assign drivers. So isn't this a scenario where there was sufficient information in front of the district court to determine there was no issue of fact on that point and that there was, from the record, a reasonable expectation that any driver could be assigned the interstate route? Well, I guess, Your Honor, the fact that there was the potential that someone could be assigned is actually belied by the actual facts of whether they were. Unlike a lot of the cases that address this Motor Carrier Act exemption and the interstate portion of it, these individuals, many of which were employed for years over several long periods of time in the transit division, and they did not move from these dedicated routes from route to route. For example, there's one individual, Dolly Lee, who worked in the transit division for 10 years and only worked on three different routes. Now, only a certain portion of that is in front of the court because of the three-year statute of limitations, but her specifically, she had over 660 trips during a three-year period and never went out of state. I think that provides whether the potential that they could go out of state, that's a good, we believe that's something a jury could evaluate. They could also evaluate, well, did they actually go out of state? It's sort of, I think, analogous to saying, well, someone, I want you to be my closer this year for the Phillies. And they say, you prepare, you may sit there and think you're going to be the closer for the Phillies every year, but when the whole season goes by and somebody else keeps being put in as the closer and you don't, do you have a reasonable expectation whether you're going to get called in for the ninth inning? Our argument to a jury is that you would not. But the point is, if you look at it from the perspective of the employer, that person could be called in. That person could be called in, but again, it's a two-part analysis and the courts were very, and we think that the individualized analysis as to the actual duties comes into play here, especially, and this was known specifically in Goldberg, the Seventh Circuit opinion. Those individuals were, like the drivers here, were in dedicated routes. They were interstate and the court said that you shouldn't look at the overall operations of the employer and what the employer said does not rule here. What you need to look at is the actual experiences of the employees and that's what we're asking. Again, it's very well possible that we could get in front of a jury and that argument could win the day. What we feel was reversible error was not allowing a jury to determine whether these facts, whether the actual driving activity allowed someone to either drive in interstate commerce or reasonably expect to do so. So you want the jury to be drawing the inference that the underlying historical facts are undisputed? The underlying facts are undisputed. And the underlying facts include the fact that the employer could indiscriminately assign a driver an interstate route? I would say that it's not that, I would say that maybe their intention and that I know someone from the HR testified to that, but again, whether they could and whether it actually was are two separate things here. These could potentially, in scenario, someone be pulled in. Yes, here's 34 individuals who were, one, the statistics show very clearly that they, over long periods of time, never drove in interstate, or two, were only within certain routes. Again, I'll draw on Ms. Lee. She testified that she only had three routes in 10 years. And if any one of those routes were not towards the latter part of her employment, none of those were interstate. And again, if you look at, they didn't really have the opportunity to drive interstate. There was, the record shows that there was, well, 32 routes during the dedicated period. There was limited opportunity to drive those routes. Were they all certified to drive interstate? I think the defendant, or excuse me, Kraft, required that they have a CDL license, yes. But again, as I, to go back. Then the question really becomes, through whose perspective do we look at this? Do we look at it through the perspective of the employer that all are, to use your analogy, in the bullpen, available to be called in? Or do we look at it through the perspective of the person who's in the bullpen but never gets called in all season? I would say you should look at it from the perspective of the driver, the person who's sitting in the bullpen, whether there was a reasonable expectation that they would actually drive in interstate commerce. I think a concern that would be prompted. And it sort of begs the action as to why did you bring this as a collective action? Well, the reason why we could bring it as a collective action, Your Honor, is for many of the reasons that the district court noted. There's certain arguments that the defendant made that could be brought in sort of as a unified part of a trial. The first part could be dealing with these certain facts, such as what were their operations, the revenues. Oh, that's undisputed. Again, I agree. We think, again, going down before the court, the court could decertify this case. But we don't think, and that has the opportunity to do so, we don't think that the individualized analysis prevents it from being a collective action trial because here there's 34 individuals. The trial could begin with this body of evidence that's unified, that's concerning each of the individuals, the CDL licenses, the revenues that Kraft generated from interstate transportation. But then it also could be brought in these individuals coming in and saying, hey, I worked there for 10 years and only had three routes, and I drove for hundreds of trips and never went out of state. I drove over 1,000 trips. For example, Harry Johnson worked there, one of the planners, for over three years, 687 trips, never traveled out of state. But the regulatory scheme seems to contemplate that for workforces that are subject to Department of Transportation rules. Because the focus is on safety, at least the way the language of the regulations and the statutes convey, that they want the DOT to dictate those issues and that the Fair Labor Standards Act and the Secretary of Labor should not be involved in that. And that's why the focus is on what type of work is performed and whether it's subject to DOT regulation. And if it's subject to DOT regulation, the Motor Carrier Exemption Act applies. It's not what the person individually does, but whether they're in a class that could perform those duties and are subject. Am I misunderstanding how the scheme works? I think, again, it's sort of the classification of the types of work that they're doing. I think some courts have recognized a driver could do a driver versus a loader. There's been some cases, like I know the Levinson case before the Supreme Court. It was looking at loaders and whether someone performed a little bit of loading activity, which is one of those classifications the Department of Transportation deems as covered by the Motor Carrier Exemption Act versus someone who does a little bit of driving. Here, again, we don't dispute the classification. But, again, the exemptions are to be read narrowly. As this Court read in Packard, someone has to plainly and unmistakably fit within these burdens. And to be exempt from the overtime law and to not have the protections of the Fair Labor Standards Act. And we think that by looking at specifically whether they got to drive in interstate commerce is a very important thing, especially from their point of view. Because of the humanitarian purpose of the Fair Labor Standards Act, by sitting there and strictly looking at it from a defendant's point of view or the company's point of view, they could sit there and say, all right, similar to the fact pattern in Packard, we have this group of individuals who aren't going to travel out of state. I get them all to have CDL licenses and do all these different regulations. But at the same time, since they do not plainly and unmistakably fit within the exemption, they're not entitled to overtime just simply because I view it as an outside possibility they could actually go. It could actually encourage companies to say, well, I'm trying to get out of state route, so there's a possibility in a grandiose sense that someone could drive interstate. But here we have evidence that actually shows that people didn't get to. I think this is very different than a case where an individual is bringing a claim and they cannot recall how many times they went out of state or they think, oh, I may have gone there once a month, twice a month, or so forth. Again, we have very specific data as to when they went out of state and when they didn't. And allow a jury, again, allow a jury to determine whether they had that reasonable expectation and even whether the defendant had that reasonable expectation based on the facts. It's one thing to say, well, I wanted people to go out of state, but they didn't actually get to go out of state during the relevant period. Again, that's a fact that would allow that a jury could evaluate. And I think, again, specifically if you look at the types of routes they did, some of these routes were merely taking individuals, the interstate routes, from the art museum down to Center City, which is only a couple of miles. We think that we could proceed on a collective action trial, but we also think that if the court were to think that this individual analysis prevented going forward as a collective, the remedy would have been to decertify the class, dismiss the claims of the individuals without prejudice, and allow them to bring individual claims. And that would be sort of the remedy rather than dismissing all their claims and finding as a matter of law they do not have the opportunity to go forward. One of the things to think about, and maybe you can do it on rebuttal, is how is an employer like Kraft supposed to decide whether to pay its employees overtime if on day one it believes that the employees can reasonably expect to cross state lines? They may not do it, but they reasonably expect to do it. I would think about that one, and we'll get you back on rebuttal. Certainly. Thank you. Mr. Schauer. May it please the court. Counsel. I believe the court understands well the arguments put forth in the police brief. Are you arguing for a class-based or a company-wide analysis? Company-wide analysis as mandated, I suggest, by the Supreme Court decision in Morris and the progeny. So you're saying you should look at 129 and not 34? Correct. So what happens if one person has never worked 20 years and has never crossed state lines? That person can't say that he or she should be paid for overtime? That's correct. Because the real issue we have here is congressionally mandated preemption, I would suggest. I think the way to view this case, and particularly the MCA exemption, the motor carrier exemption from the Fair Labor Standards Act, is Congress said there are certain entities, companies, doing business in ways that we are going to subject them to regulation of the regulatory body, the DOT in this case, that best knows how to address what these companies do. And that's exactly what Morris recognizes. What's the rationale as to if you are governed by DOT, what's the rationale for why you are exempt from getting overtime, whereas if you are not governed by DOT, you are not exempt? Well, again, the rationale is that the Congress said DOT regulates the safety of individuals who operate motor carriers who operate in interstate commerce. What does that have to do with overtime? That's what I can't figure out. Well, part of the regulation that's performed by DOT is to prescribe, establish qualifications, and maximum hours of service. That's what the exemption says in the Fair Labor Standards Act. And so that body is determining what is the appropriate way to regulate the activities of drivers in interstate commerce. The maximum hours of service is, you know, the people who do cross-country trips and are up for inordinate periods of time on some type of drug to keep them going. I got that. But what has that got to do with overtime being precluded to those who happen to be governed, perhaps for safety purposes, by DOT? I'm asking for the policy here. Well, I believe it is the policy as reflected even in the Fair Labor Standards Act. What's the basis for the policy? The basis is that the employer should not be subject to regulation with regard to its employees in the terms and conditions of employment by two separate regulatory bodies. I would suggest that there's language in the Packard case. Does the Motor Carrier Act exemption go back to the enactment of the Fair Labor Standards Act? Yes. And there was a stronger lobbying organization at the time. That's the policy behind it. There's language in the case of Packard. Packard contains language that says while many people believe that the Fair Labor Standards Act might be designed because they think it's a good idea to pay people overtime, remember the roots of the Fair Labor Standards Act, frankly, were in the Depression, and the real purpose of the Fair Labor Standards Act, I would suggest, is to require that the employer hire or to penalize an employer such that they'll hire another employee. It's a full employment policy statute. That's what the statute's there for. You can work somebody 24 hours straight, as we all know, and they don't get paid overtime. So it's not as though the decision was made that, well, if somebody has to work over, say, eight hours a day, most people think of it as, well, if you work more than eight hours a day in a week, you can work somebody 24 hours straight under the Fair Labor Standards Act, and you don't owe them overtime. It's not a determination that, you know, it's burdensome or difficult if you do that. It's more based on it's a full employment measure. It was enacted in 37 as part of the New Deal, and that's where that came into play. Whereas, you know, and then Congress said, however, with respect to, you know, the people who are going to be out there driving large coach buses, you know, commercial vehicles, we want them to be regulated by the body that, you know, best understands how to do that. And the cases have also been clear that Morris and its progeny, as cited by Judge Yon, they've been clear to say that even if the DOT has not exercised its power in a given area, i.e., requiring overtime for whatever number of hours, even if they haven't exercised the power, that doesn't mean that the jurisdiction doesn't attach and that the exemption under the Fair Labor Standards Act doesn't attach. I would suggest that the argument being made by the appellant here, as touched upon by the court, it kind of reminds me of what I read in cases or briefs discussing decertification motions. Kind of paradoxical that here we have a plaintiff in a collective action arguing for individual review and treatment of the plaintiffs. That's not what the cases call for. The Pyramid case that was cited by Mr. Santillo actually involves loaders. And a number of the cases that are cited for propositions of law are, I would suggest, an opposite to this particular situation because, for example, with loaders, the MCA exemption is extended to essentially, and the DOT jurisdiction, to anybody involved in safety-affecting activities. That's kind of the term that is used. Is this person in safety-affecting activities such that somebody who's driving a forklift and loading a truck or taking care of the brakes or servicing the commercial vehicles that are used in interstate, they also are subject to this exemption? So your view is even if this were an individual action, were it a collective action, we have just the plaintiff as the individual. That test that you just articulated is, is the individual involved in safety-affecting activities? Your view would be the outcome would be the same because as sort of a DOT-regulated driver, the regulations require him to be or her to be prepared to drive interstate and the company could assign an interstate route. So whether it's collective or individual, from your point of view, it really doesn't matter, right? Well, as I learned in law school in Newport, what I think doesn't really matter, but the cases say so. And I do believe the cases. I think in that case, I think they have it right. The Morris case, there were two individuals that never drove out of state. There are other cases where there are individuals who never drove out of state. I think you need to be careful when, you know, reviewing the briefs and some of the citations and they are properly cited. I'm not suggesting Mr. Santillo is a very good advocate and he's a very good advocate to have a case with or two. But in Pyramid, they were talking about loaders. And in several of the other cases that are cited by the appellants, Goldberg, what the courts did there on what I would suggest were much more sparse records than before this court. Also, the Stern Court case, S-T-U-R-N, what the courts did there on a relatively sparse record, a couple of declarations, appeared to be motions for summary judgment that were filed early in the case, unlike this case. The court says, all right, it appears that there are actually groups of drivers employed by this company who always go out of state, always are assigned to go out of state. There are groups or classes of drivers that never go out of state and have no chance to go out of state, all within the same employer and the employer-employee group. The courts say, well, you have to look at what the individuals do to decide which class they're in, whereas in those situations, it was not the case that any given employee could be assigned indiscriminately to be engaged in interstate commerce, to drive across state lines. Those are very different cases. Those are the Goldberg, Cozen, Stern, all involved situations where the evidence of record anyway, and many of those were remanded because of insufficient evidence in the record, but they were remanded, Stern is one of them, that says, look, it looks like from the record that there's a group of employees that never go out of state or some that might go out of state. You have to look at that. That's where there is discussion of looking at the employees' activities, and that is the way to fit them into those categories. Couldn't that be done here, though, in terms of you've got this evidence that's been compiled and you can look at, it gave us an example of somebody who did 600 trips and never went out of state. Couldn't we say, while they may be subject to being assigned to an interstate route, it's so unlikely, or a jury should decide, at least as to that individual, when the case goes forward. There were five depositions of class members. There were four depositions of management. There were, well, compared to the last case we heard, not much evidence, but there were boxes of. I thought this case was simple when I came in, and after hearing that last argument, I am convinced it's extremely simple, the issue of the MCA exemption. But to your point, I'd suggest what the law says is that the mere fact that the person was not assigned isn't the issue, and that's what Morris says, what the progeny says. I felt that Judge Young made a very good observation in distilling the lesson, and he said, well, it appears in those cases what they look at is, you know, what is the selection mechanism for assignment of the drivers? You know, is it fixed, i.e., people in this category or these drivers never go out of state, they drive this way or that way. In this case, undisputed fact that a driver could reasonably expect to be assigned to drive in interstate commerce at any time. I mean, the company obviously structured itself to do that. You know, it went through the rigorous requirements of maintaining all the necessary records, a driver qualification file, et cetera, et cetera. I mean, to Judge Ambrose's question, you know, arbitrarily make sure they assign somebody to drive out of state every, you know, tenth day. I mean, that's one way we could satisfy these concerns, but that's not what's required under the scope of the exemption that we're arguing about here. Again, I want to get back to Pyramid 2, because Pyramid involved loaders, and there it becomes a very specific question of, well, did they, you know, truly affect safety? Did, were they involved in making sure that the load was put on the truck such that it didn't shift improperly? Those kinds of things. Those are very fact-specific, and that's what the Pyramid case was considering, whereas here, you know, the plaintiff got the class it wanted. The plaintiff got the class it wanted. The plaintiff asked for all individuals who were employed by defendant as transit route drivers who worked over 40 hours during any work week within the past three years. That's the class of people that was defined and requested, you know, in the collective action that was pursued. Those are the people who received the notices. Those are the people in the grand scheme of it that I suggest the company, you know, is in the courts, or to look at for purposes of application of the motor carrier exemption. I take it that your view is that de minimis exception doesn't apply because there's no case that really says it applies to drivers, and because these drivers could be assigned to the interstate route, and therefore it could not be de minimis. Is that your position? Well, the de minimis rule or exception I think actually goes to, is there really sufficient interstate commerce? It doesn't require a whole lot. As you know, federal jurisdiction attaches based upon typically interstate commerce, Fair Labor Standards Act. You know, it applies to companies in interstate commerce, $500,000. I suggest that the de minimis is, well, you know, you can't have just one driver in the, let's say in the CRAF situation that goes out of state, and therefore everybody is in interstate commerce or potentially interstate commerce. So they say there has to be some minimal threshold, you know, of the activities of the company as a whole. In Morris it was like 3.4% of the. It was 4%. There's actually a very interesting discussion of all that in the MOSSON, M-O-S-S-O-N, case cited by appellants where it's the Southern District of New York, but they do a pretty thorough review of the various cases, finding some down as low as 1%, again. It goes to, you know, it goes to could the Department of Transportation have asserted jurisdiction. Nor is this a case where it just happened that a CDL driver, you know, what CRAF does is much more than require their drivers have CDL licenses. It is a situation where one person happened to go out of state on a CDL, and therefore perhaps the exemption applies. Morris, citing Judge John's opinions, says the Supreme Court held that these trips were thus a natural, integral, and apparently inseparable part of the common carrier service of the petitioner and his drivers. In looking at, you know, the indiscriminate assignment of the trips, et cetera, and so obviously they're the focus, and I suggest as with all the progeny, with respect to drivers who can be indiscriminately assigned and are in interstate commerce on more than a de minimis basis, okay, hold. I guess in closing I would just quote one of the final quotes from Judge John. He says, while these select plaintiffs happened to have been called upon to drive interstate rather infrequently during the relevant time period, that does not change the fact that the plaintiffs were subject to driving interstate at all times and were reasonably likely to do so based on KCI's interstate routes. There's no facts even suggested that are out there that might controvert that. It's a very careful analysis of undisputed facts, and I suggest the plaintiff would like to have the jury reconsider Judge John's decision, but that's not appropriate in this case. Thank you very much. Mr. Santillo. To address Judge Amber's question before I conclude the last time, I think that if a company wants to open itself up to avoid paying people time and a half overtime, there are certain hurdles it has to get over, and that's a business decision that the company has to make. One way, if this case came forward where these drivers were rotating, they were going from one interstate trip in a day to a completely intrastate trip in a day, it's a completely different story, but that's not what the facts show, and that's what I think a jury should still have the ability to decide, whether someone who sat there and worked for a decade, three years, drove 600 trips and never went out of state, whether there was that reasonable expectation, a true reasonable expectation that they could drive in interstate commerce. I wanted to address something Judge Schwartz mentioned about the de minimis exception. The Ninth Circuit in Reich actually addressed the de minimis exception, and they did it in terms of interstate driving. If I may quote from the opinion at page 1155, nevertheless an employee's minor involvement in interstate commerce does not necessarily subject the employee to the Secretary of Transportation's jurisdiction for an unlimited period of time, and if the employee's minor involvement can be characterized de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all. And again, that's consistent with what this Court held in Frederick, where it not only recognized the de minimis exception, it relied on Department of Transportation regulations to say that the de minimis, to craft its reasonable expectation standard. And the Department of Transportation regulations actually state that jurisdiction does not attach if there is no possibility of the individual driver doing interstate driving or if the possibility of interstate driving is remote. That's at 46 FREG 37902. And I bring that up because if we were to solely look at the company-wide or the employer side of things, there would be no need for the Department of Transportation to have articulated that if someone's possibility of driving interstate was remote, that they wouldn't be covered by the Department of Transportation's Motor Carrier Act. What's that last site? I'm sorry? What is the last site you said? 46 FREG 37902. And also I think it's important to recognize that this Court in Frederick mentioned that the Motor Carrier Act exemption does not give employers carte blanche authority to relieve themselves of the FLSA overtime requirements. We believe that, again, by looking strictly at the company's operations, it would give them that carte blanche. Also, we think that the individualized analysis is consistent with other precedents. As I mentioned Pyramid, but also we believe in Goldberg and in Trout, they said that an individualized analysis needs to be done. And, in fact, I think the Seventh Circuit in Goldberg was a little frustrated that the district court failed to do that. We also think that this Court in Harshman approved or affirmed the Western District of Pennsylvania's analysis, in which it did do an individualized analysis of the drivers to see how often they were crossing state lines. Again, these are fixed routes. This is a little different than sort of someone coming in and sort of a first-in, first-out type of scheduling, where someone comes in and says, okay, I'm here, what's the first thing I can do? Well, here's a route that takes you to New Jersey, or here's a route to take you to Delaware. Again, this is not on-demand scheduling, where someone may say, hey, an oil rig in Texas broke today. I need you to go up and run up a part. These are fixed routes, routes that are negotiated between the company, and they exist for significant periods of time. And, again, there is a limited opportunity for these individuals to drive interstate. What would be a de minimis amount, below which you would say it is de minimis? I would say that certainly for these individuals, I would say that a de minimis amount, I know there's been back and forth. I know Morris recognized a 4%. Here, the individuals, 34 plaintiffs out of basically 14,000 trips, only 178 went out of state. That's 1.3%. And so I think a de minimis amount, I know some courts have relied on Morris. Since I represent workers, I would encourage it to be higher, but I know that would go without saying. But we think that the de minimis argument would allow a jury to potentially find that someone didn't reasonably have the opportunity to travel interstate, didn't regularly travel interstate and didn't reasonably expect to do so. That, coupled with the requirements that this Court set forth in Packard, that the exemptions be read narrowly against the defendant and that someone fits plainly and unmistakably within the terms of an exemption, would require that at least these individuals be given the opportunity to take it to a jury. Thank you very much. Thank you to both counsel for well-presented arguments, and we'll take the matter under advisement.